**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| POOJA KHUNGAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18-cv-01454 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ACCESS COMMUNITY HEALTH | ) | |
| NETWORK, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Pooja Khungar, a pediatrician, has brought this suit against Defendant Access

Community Health Network ("ACHN"), her former employer. She alleges that ACHN

discriminated against her on the basis of her national origin and race (Indian and Southeast

Asian), as well as her religion (non-Christian), and also terminated her in retaliation for

complaining about the treatment to which she was subjected, all in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. Now before the Court are

ACHN's motion for summary judgment under Federal Rule of Civil Procedure 56 (Dkt. No. 50),

as well as various motions by the parties seeking to strike certain material from and add certain

other material to the summary judgment record (Dkt. Nos. 70, 71, 76, 80, 83). For the reasons

discussed below, the Court grants ACHN's summary judgment motion and disposes of the

various other motions as indicated below.

### BACKGROUND

The parties dispute many material facts. Here, for purposes of considering summary

judgment, the Court sets forward the facts as favorably to Khungar, the nonmovant, as the record

and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

Khungar claims that, as an Indian doctor who does not practice the Christian faith, she faced discrimination at the hands of the largely Hispanic and Christian staff at her former workplace. Khungar began working for ACHN as a pediatrician around July 28, 2014. (Pl.'s Resp. to Defs.' Statement of Undisputed Facts ("PRSOF") ¶ 1, Dkt. No. 62.) She worked at ACHN's Kedzie Health Clinic in Chicago throughout her employment with ACHN. (Defs.' Statement of Undisputed Facts ("DSOMF") ¶ 1, Dkt. No. 49.) Around May 31, 2016, ACHN confirmed that Khungar was fully credentialed in accordance with state guidelines and ACHN policies and approved her employment from July 1, 2016 to July 1, 2018. (PRSOMF, Ex. 12, Dkt. No. 62-1.) Khungar's employment contract renewed automatically each year, provided neither she nor ACHN terminated it; it last renewed on July 28, 2016. (DSOMF, Ex. U, Landivar Dep. 31:1–19, Dkt. No. 49-21.)

While the parties agree on the identities of the individuals who worked with Khungar at ACHN, they disagree on the roles that Khungar's colleagues played in her termination. Until August 12, 2016, Dr. Charles Barron served as the regional medical director and Khungar's immediate supervisor. (DSOMF ¶ 3.) Dr. Andres Mafla subsequently replaced Barron in that role. Beginning in February 2016, Dr. Jairo Mejia served as chief medical officer, a role in which he oversaw providers like Khungar and provided guidance for patient care and regulatory issues. (DSOMF ¶ 5; Ex. E, Mejia Dep. 5:7–11, Dkt. No. 49-5.) The individuals who interacted with Khungar most frequently at the Kedzie clinic were fellow pediatrician Dr. Tara De Jesus, health center manager Alicia Mariscal, and medical assistants Jasmine Angel and Gloria Rosales. (DSOMF, Ex. AA, De Jesus Dec. ¶ 1, Dkt. No. 49-26; DSOMF ¶¶ 6, 13.)

By 2015, Khungar's relationships with her Kedzie clinic colleagues had begun to deteriorate. Khungar contends that because she was not Hispanic or Christian like most of her coworkers, the others singled her out for disparagement based on her ethnicity and religion by mocking her for her "ethnic cooking" and "Indian religion," excluding her from Christian religious celebrations, and otherwise harassing her. (PRSOMF, Ex. 43, Khungar Decl. ¶ 23, Dkt. No. 62-4.) Khungar further contends that Mariscal, upset she had not been asked to participate in recruiting Khungar, told Khungar she would not have let a white nurse practitioner from Yale work at Kedzie and implied that a "rich white woman who shops at Bloomingdales" would not be suited to Kedzie. (*Id.* ¶ 3.) Khungar also claims that Mariscal favored De Jesus, who, like Mariscal, was Puerto Rican, over Khungar. (*Id.* ¶ 5.) Khungar claims that she complained about these problems to Barron at a November 2015 meeting that included Mariscal, after which Mariscal targeted Khungar for mockery based on her ethnicity and worked with De Jesus actively to solicit complaints from patients about Khungar. (*Id.* ¶ 13.)

ACHN contends that any problems Khungar experienced at Kedzie resulted from her own behavior toward staff and patients. On August 18, 2015, Barron sent Khungar what he labelled a "final warning" letter, which chastised her for accessing the medical record of a patient to obtain contact information for an employee who was absent from work. (DSOMF, Ex. J, Aug. 18, 2015 Letter from Barron, Dkt. No. 49-10.) Concerned for the absent employee's safety, Khungar accessed a patient chart to find the phone number of that employee's relative. (PRSOMF, Ex. 43, Khungar Decl. ¶ 6.) But because Khungar accessed the patient's information for what ACHN deemed to be her own personal use, a violation of the patient privacy protections set out in the Health Insurance Portability and Accountability Act ("HIPAA"), Barron cautioned

her that this letter served as her "Final Warning." (DSOMF, Ex. J., Aug. 18, 2015 Letter from Barron.)

In addition, on May 3, 2016, a patient's mother complained to De Jesus that Khungar had not fully examined a thirteen-year-old patient to determine the root of her pelvic pain and instead insinuated without any evidence that the child was sexually active. (DSOMF ¶¶ 10–11; DSOMF, Ex. L, Patient Complaint, Dkt No. 49-12.) ACHN further contends that on May 19, 2016, Angel complained to Mariscal that Khungar made comments to Rosales and Angel implying that Rosales was not performing her job correctly. (DSOMF, Ex. F, Mejia Decl. ¶ 6, Decl. Ex. 2, Dkt. No. 49-6.) Those complaints were routed to Mariscal, who apparently passed them on to Barron. (DSOMF, Ex. C, Barron Decl. ¶¶ 2–3, Dkt. No. 49-3.) Barron subsequently conducted a performance review with Khungar on June 6, 2016. (DSOMF ¶ 14; PRSOMF, Ex. 43, Khungar Decl. ¶ 10.) He now contends that he told Mejia and others at a credentialing committee meeting on June 8, 2016 that he had concerns about Khungar's performance and would address them with her, but Khungar contends he never raised any concerns about her behavior either at the performance review or afterward. (DSOMF, Ex. C, Barron Decl. ¶¶ 2–6; PRSOMF, Ex. 43, Khungar Dec. ¶ 10.)

Shortly after Khungar's performance review, De Jesus and Mariscal received another complaint from a parent, who told De Jesus that Khungar had recommended that her son not take his psychiatric medication out of a concern he would become impotent, despite the fact that the parent believed the medication was helping her child. (DSOMF, Ex. X, June 2016 De Jesus Complaint, Dkt. No. 49-24; *id.*, Ex. AA, De Jesus Decl. ¶ 2.) De Jesus also told Mariscal that Kedzie staff had received a number of unsolicited complaints from parents about Khungar failing to listen during appointments, not properly examining patients, not explaining herself during

appointments, and sharing inappropriate personal information (such as her dating life) with them. (DSOMF, Ex. X, June 2016 De Jesus Complaint; *id.*, Ex. AA, De Jesus Decl.; *id.*, Ex. DD, Aug. 25, 2016 SafetyZone Report, Dkt. No. 49-29.) Khungar contends that these were not spontaneous, unprompted complaints; instead, she believes that Mariscal and De Jesus actively solicited complaints from patients in retaliation for Khungar complaining to Barron about Mariscal's racist statements. (PRSOMF, Ex. 43, Khungar Decl. ¶ 13.) Regardless, all of the complaints about Khungar were forwarded to Barron and, after his departure, Mejia.

On June 9, 2016, Mariscal complained in an email to Barron, Laura Whalley (a regional director at ACHN), Etta Henderson (ACHN compliance director), and various other individuals working in human resources about Facebook messages that Khungar exchanged with a Kedzie medical assistant, Mayra Gonzalez, characterizing the exchange as one in which Khungar claimed she was denied a raise because Angel was a "back stabber." (DSOMF ¶ 16; DSOMF, Ex. O, Mariscal June 9, 2016 Email, Dkt. No. 49-15.) In the messages submitted by Khungar in opposition to summary judgment, however, Khungar merely informs Gonzalez that, at her meeting with Barron, Khungar requested she no longer be assigned to work with Angel. (PRSOMF, Ex. 52, Facebook Messages., Dkt. No. 62-9) The following morning, Khungar contacted Whalley and Henderson about a Facebook post shared by Angel in May 2015 that noted a deceased child was a patient at ACHN. (DSOMF ¶ 18; *id.*, Ex. Q, June 9, 2016, Email from Laura Whalley, Dkt. No. 49-17.) Henderson and Stephanie Lilly, then a human resources manager, directed Angel to remove the post, which she did. (DSOMF ¶ 19.) Khungar contends she had reported Angel's Facebook post to Mariscal prior to June 2016 and that Mariscal had failed to take any action. (PRSOMF, Ex. 43, Khungar Dec. ¶ 11.)

Khungar asserts that throughout this time, her coworkers continued to make inappropriate comments about her ethnicity and religion. After Rosales asked Khungar inappropriate personal questions about Khungar's religious beliefs (such as whether she believed in God) and whether she would ever date a Hispanic man, Khungar requested that Mariscal speak with Rosales about her conduct and reassign Rosales so she would work with other physicians. (DSOMF, Ex. R, June 11, 2016, Khungar Email to Mariscal, Dkt., No. 49-18.) Khungar contends that Mariscal called her a liar. (PRSOMF, Ex. 49, Khungar Dep. 104:11–19, Dkt. No. 62-6.) ACHN, on the other hand, contends that Mariscal told Khungar that Rosales would be reassigned; however, despite Khungar's appeal to Mariscal, Khungar still sometimes had to work with Rosales, who began leaving pamphlets about Christianity in Khungar's patient-exam rooms. (PRSOMF, Ex. 49, Khungar Dep. 113:14–18.) Despite Khungar's efforts, no file was maintained at ACHN regarding her complaints of harassment. (DSOMF, Ex. FF, Riley Dep. 54:16–19, Dkt. No. 49-31.)

On June 15, 2016, Mariscal emailed Lilly, Mejia, Barron, and Whalley to report a series of complaints about Khungar that she claimed to have received from other Kedzie staff members. (DSOMF ¶ 27; *id.*, Ex. M, Mariscal Decl., Decl. Exs. 1–3, Dkt. No. 49-13.) In one complaint, a parent of a patient complained that Khungar had appeared bored and failed to conduct a physical exam of the patient, despite the patient complaining of pain. (DSOMF, Ex. M, Mariscal Decl., Decl. Ex. 1.) Mariscal also asserted that employees were complaining about Khungar allegedly snapping at Angel, following Angel around to make sure she did not draw blood from a patient, refusing to speak to her outside of work, and bad mouthing her to other employees. (*Id.* Decl. Ex. 3.) Khungar does not dispute that this email was sent but contends that Mariscal actively sought to solicit complaints about Khungar, rather than simply documenting

complaints that employees brought to her unprompted. She further claims she was never informed about any of the complaints. (PRSOMF, Ex. 43, Khungar Decl. ¶¶ 7–8.)

Mejia contends that at some point in July 2016, after all the above had occurred, Barron spoke with him regarding Khungar's "poor performance." (DSOMF ¶ 30; DSOMF, Ex. F, Mejia Decl. ¶ 3.) Mejia emailed Eleva Riley, ACHN's Vice President of Human Resources, noting the "multiple situations" with Khungar and his purported concern that she was "not mentally stable" and needed to be closely observed. (DSOMF ¶¶ 36, 51; DSOMF, Ex. Z, June 17, 2016 Mejia to Riley Email, Dkt. No. 49-25.) In doing so, he forwarded an email that De Jesus had sent Mariscal detailing that Khungar made her uncomfortable by revealing personal details about Khungar's ex-boyfriend and that many patients complained to De Jesus that Khungar did not listen or explain things clearly, did not examine them, and inappropriately shared personal details such as financial troubles and her problems with her ex-boyfriend, with them. (*Id.*) And on July 12, 2016, De Jesus emailed Mariscal another complaint from a parent, in which the parent claimed Khungar failed to examine her daughter's abdomen despite the daughter complaining of severe abdominal pain, which a second doctor diagnosed as appendicitis. (DSOMF ¶ 37; *id.*, De Jesus Decl. ¶ 2, Decl. Ex. 1.) After receiving a copy of the complaint, Mejia emailed Lilly to let her know he would be "keeping the situation on hold" to see how Khungar behaved; in response, Lilly told him it was "inevitable" Khungar would have "to be let go" soon. (DSOMF, Ex. F, Mejia Decl. ¶ 10, Ex. 6.) Throughout August, Mariscal recorded additional complaints about Khungar failing to conduct detailed examinations of patients and missing diagnoses. (DSOMF ¶¶ 45, 47.)

At some point in September, Mejia decided to recommend that ACHN terminate Khungar's employment by not renewing her employment agreement. He contends that he did so

"[b]ased on the number, nature, and severity of complaints from minor patients' parents regarding the poor medical care and treatment" Khungar delivered. (DSOMF ¶ 48; *id.*, Ex. F, Mejia Decl. ¶ 16.) Mejia met with Mariscal, De Jesus, and Whalley on September 28, 2016 to let them know he would be recommending Khungar's termination based on parents' complaints and that De Jesus, the only other pediatrician, would be responsible for Khungar's patients after she left. (DSOMF ¶¶ 49–50.) Mejia then notified Riley and Lilly of the same. (DSOMF ¶ 51; DSOMF, Ex. K, Sept. 28, 2018 Mejia Email, Dkt. No. 49-11.) At some later point, Riley reviewed the same complaints that Mejia had seen before ultimately approving the termination recommendation. (DSOMF ¶ 59; *id.*, Ex. B, Riley Decl. ¶ 6, Dkt. No. 49-2.)

On November 21, 2016, Mejia, Lilly, and Mafla[1] met with Khungar and informed her that ACHN was terminating her employment with a 90-day notice period. (DSOMF ¶¶ 60–61.) ACHN contends that Mejia then provided Khungar with the 90-day written notice required to terminate her employment; Khungar, however, contends that she never received the notice and that she attempted to resign instead. (DSOMF, Ex. E, Mejia Dep. 42:13–43:7; PRSOMF, Ex. 43, Khungar Dep. 242:3–12.) Later that same day, Khungar emailed Mejia, Lilly, and Mafla to note that her complaints about inappropriate and culturally insensitive behavior had never been addressed. (DSOMF ¶ 64.) Mejia responded that he had not known about any of those allegations prior to the termination meeting and he would forward her email to human resources for investigation. (DSOMF ¶ 65; *id.*, Ex. II, November 21, 2016 Email Chain, Dkt. No. 49-34.) Riley then arranged to meet with Khungar to discuss her complaints (though they twice

---

[1] Mafla became interim regional medical director at some point around the end of October or start of November 2016. (DSOMF, Ex. D, Mafla Dep. 4:21–5:4, Dkt. No. 49-4.) While the parties appear to agree that Mafla was at the termination meeting on November 21, 2016, the only mention of Mafla's potential presence was by Mejia in his deposition, in which he could not recall whether Mafla had attended the meeting. (DSOMF, Ex. E, Mejia Dep. 43:6–10.)

postponed the meeting due to Khungar being ill), and Riley ultimately terminated Khungar before the meeting could take place. (DSOMF ¶¶ 69–70.)

On November 30, 2016, Khungar filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that she had faced discrimination on the basis of race, sex, religion, and national origin. (DSOMF, Ex. LL, Nov. 30, 2016 EEOC Charge, Dkt. No. 49-37.) She contends that she informed Mariscal immediately after she filed the charge. (PRSOMF, Ex. 43, Khungar Decl. ¶ 20.)

On December 14, 2016, Riley terminated Khungar's employment, effective immediately, purportedly as a result of a statement Khungar made on December 10, 2016. ACHN and Khungar have drastically different interpretations of the December 10 incident. Khungar contends that she was working with Marcy Sooneva, another ACHN employee, to file paperwork. (PRSOMF, Ex. 49, Khungar Dep. 289:17–20.) After obtaining government approval for an extremely expensive and time-sensitive treatment for an infant patient, Khungar asked Sooneva to scan the document confirming the treatment because Khungar would be departing before the treatment was complete. (*Id*. 291:9–292:7.) As Khungar did so, she said that "[i]f anything happens to this piece of paper, if there's a fire, if there's a flood, if somebody rips this piece of paper, I can't come back and sign it." (*Id*. 292:7–11.) She heard a medical assistant, Julie Loza, say "don't do it" but had no idea what Loza meant by it. (*Id*. 292:12–293:4.) From Khungar's perspective, her remark was clearly facetious.

ACHN, however, has a different take on the December 10 incident. Loza, who admits she was not part of Khungar's conversation with Sooneva, states that she heard Khungar say something along the lines of "what will happen if this place got on fire." (DSOMF, Ex. MM, Loza Dep. 38:16–39:9, Dkt. No. 49-38.) Loza jumped in to tell Khungar that if she wanted to do

something to the clinic, she should do it when Loza was not present. (*Id*. 39:20–24.) Loza appears to have taken Khungar's statement at least somewhat seriously. The following Monday, another Kedzie physician, Paula Cavens, apparently overheard Loza discussing the December 10 statement and reported it to Mariscal and Lilly, who subsequently informed Riley. (DSOMF, Ex. FF, Riley Dep. 68:22–69:21.) On December 14, 2016, Riley visited the Kedzie clinic to investigate. (*Id*. 71:3–8.) During her visit, she met with Loza, Cavens, and Khungar, and had Loza make a written statement about the incident. (*Id*. 72:1–19.) Riley did not ask Khungar about the context in which the December 10 statement was made. (*Id*. 73:20–22.) But Riley did ask Khungar if she had actually made a statement about the building catching fire after she left. (*Id*. 73:7–13.) Riley later testified that Khungar responded flippantly. (*Id*.) According to Riley, Khungar denied having made the reported statement and instead told Riley that she said "what happens if the place blows up when I leave?" (*Id*.) However, Khungar contends that she denied making any such statement and told Riley that all she said was that the particular paperwork needed to be scanned in case it happened to be destroyed. (PRSOMF, Ex. 49, Khungar Dep. 303:22–304:5.) At that point, Riley terminated her on the spot and stayed with her as Khungar packed up her items and left. (DSOMF, Ex. FF, Riley Dep. 66:20–67:11.) Riley subsequently sent Khungar a letter confirming that Khungar had been terminated for making an inappropriate statement on December 10. (DSOMF ¶ 81.) Khungar does not deny receiving the letter, but contends that the reason given was a pretext for her unlawful termination.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To do so, the movant must identify

10

relevant segments from the pleadings, depositions, admissions, affidavits, or answers to interrogatories that demonstrate the lack of any genuine material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On the other side, to defeat a summary judgment motion, an opposing party must respond by setting forth specific facts showing there is a genuine factual issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a genuine factual issue for trial, the Court must view all evidence in the light most favorable to and draw all reasonable inferences in favor of the nonmovant. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). But the genuineness of a factual dispute suffices to defeat a motion for summary judgment only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lawrence v. Kenosha County*, 391 F.3d 837, 842 (7th Cir. 2004) (quoting *Anderson*, 477 U.S. at 248). The "mere existence of *some* alleged factual dispute" does not suffice to defeat a motion for summary judgment. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (citation and internal quotation marks omitted).

### I.     Discrimination Based on Race, National Origin, and Religion (Count I)

In Count I, Khungar claims that ACHN unlawfully discriminated against her based on her race, national original, and religion.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To survive a motion for summary judgment on a Title VII discrimination claim, a plaintiff must present "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse

employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id.* Nonetheless, when considering a summary judgment motion, the Court may utilize the burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "as an efficient way to organize, present, and assess evidence." *Johnson*, 892 F.3d at 894; *see also David v. Bd. of Trs. of Cmty. College Dist. No. 808*, 846 F.3d 216, 224 (7th Cir. 2017) (noting that *Ortiz* "did not alter" the *McDonnell Douglas* burden-shifting framework.) Here, the parties invoke the *McDonnell Douglas* framework in making their arguments, so the Court will address the arguments using that framework as well—bearing in mind that the ultimate question is whether Khungar has presented enough evidence of discrimination to support a jury verdict in her favor.

### A. *McDonnell Douglas Prima Facie* Case

To establish a *prima facie* case of discrimination under the *McDonnell Douglas* framework, Khungar must demonstrate that (1) she is part of a protected class; (2) her job performance met her employer's expectations; (3) she suffered an adverse employment action; and (4) at least one similarly-situated individual outside her protected class received better treatment. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). With respect to the second element, a plaintiff generally must show that she met her employer's legitimate expectations unless she alleges that the employer selectively punished her even though other employees failed to meet expectations. *Curry v. Menard, Inc.*, 270 F.3d 473, 478 (7th Cir. 2001); *Flores v. Preferred Tech. Grp*, 182 F.3d 512, 515 (7th Cir. 1999). If a plaintiff establishes a *prima facie* case of discrimination, the employer must then "set forth a legitimate

nondiscriminatory reason for [the adverse employment action] which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Nichols v. S. Ill. Univ.—Edwardsville*, 510 F.3d 772, 783 (7th Cir. 2007) (citation and internal quotation marks omitted). If the employer does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason for the adverse employment action was pretextual. *Walker v. Glickman*, 241 F.3d 884, 889 (7th Cir. 2001). To show pretext, the plaintiff must demonstrate either that her employer's motive was a discriminatory one or that the proffered reason is "unworthy of credence." *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003).

Here, Khungar has satisfied the first element of a *prima facie* case: she has shown that she is a member of a protected class due to her race (Asian), her national origin (Indian), and her religion (non-Christian). She also has satisfied the third element because she suffered an adverse employment action when ACHN terminated her. Khungar runs into trouble, however, with the second and fourth elements.

For the second element, Khungar has not adduced sufficient evidence that her performance met ACHN's legitimate expectations. With respect to her interaction with patients alone, ACHN has produced a multitude of complaints from parents contending that Khungar did not properly treat their children. One complaint, for example, alleges that Khungar failed to examine the abdomen of a child patient complaining of abdominal pain. (DSOMF ¶ 37; *id.*, Ex. AA, De Jesus Decl. ¶ 2, Decl. Ex. 1.) Another complaint accuses Khungar of insinuating that a thirteen-year-old patient was suffering from pelvic pain because she was sexually active and failing to examine her fully. (DSOMF ¶¶ 10–11; *id.*, Ex. L, Patient Complaint.) Whether these complaints were solicited by De Jesus and Mariscal, as Khungar contends, is of no moment—

what matters is that the complaints were forwarded to Barron, the regional medical director and Khungar's immediate supervisor until mid-2016, and Mejia, the chief medical officer overseeing providers.[2] Both Barron and Mejia attest that they reviewed those complaints, and Mejia states that he decided to recommend that Khungar be terminated because he believed the complaints evidenced poor work performance. (DSOMF, Ex. C, Barron Decl. ¶ 3; DSOMF, Ex. F, Mejia Decl. ¶ 16.) In fact, Mejia noted in an email to Riley and Lilly that he believed Khungar's poor performance was putting patients and the organization at high risk. (DSOMF, Ex. K, Sept. 28, 2016 Email Chain.)

Moreover, beyond the patient complaints, Khungar does not dispute that she received a final written warning on August 18, 2015 for accessing a patient's file to obtain contact information for an absent coworker. (DSOMF, Ex. J, Aug. 18, 2015 Letter from Barron.) Khungar may have had good intentions in doing so—indeed, she contends she was concerned for the absent employee's safety. (PRSOM, Ex. 43, Khungar Decl. ¶ 6.) But it remains undisputed that Barron, her supervisor, considered it to be a serious HIPAA violation worthy of a warning letter. Khungar therefore cannot dispute that she had at least one mark on her record an entire year before she was terminated.

Even if Khungar could demonstrate that her work performance was satisfactory, she fails to identify any similarly-situated individual who received better treatment than she received—the fourth element of a *prima facie* case. To do so, she must find coworkers who had a similar set of disciplinary issues. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)

---

[2] Mafla, Barron's replacement, was not hired until late October or early November 2016, after many of the events described had taken place. He testified that he did not follow up with complaints about Khungar because Mejia was taking care of the situation, and that while normally the regional medical director was responsible for reviewing complaints, the decision to terminate Khungar had already been made before Mejia joined ACHN. (DSOMF, Ex. D, Mafla Dep. 27:1–29:17.)

(finding a coworker not to be similarly situated because no "comparable set of failings" existed). Moreover, to be similarly situated, the Seventh Circuit generally requires two employees facing disciplinary issues to have "dealt with the same supervisor, [be] subject to the same workplace rules, and [have] engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003).

Khungar contends that ACHN treated non-Indian providers more favorably than it treated her. She uses as two examples medical assistant Angel, who posted private patient information on Facebook, and De Jesus, who Khungar alleges threatened her. Khungar does not clearly state that her purported comparators had a different race, national origin, or religion than her, which is a prerequisite to her disparate treatment claim. But even assuming that Angel and De Jesus are not members of one or more of the same protected classes as Khungar, she still fails to show that they are appropriate comparators.

First, with respect to De Jesus, Khungar has adduced no evidence suggesting De Jesus had any staff or patient complaints filed against her, let alone multiple complaints as was the case with Khungar. Nor does Khungar suggest that De Jesus committed a HIPAA violation. Khungar instead offers that, at one point, Barron told Mejia that he thought De Jesus had an issue with the way she communicated with people. (DSOMF, Ex. E, Mejia Dep. 74:4–9.) Khungar also notes that De Jesus had some sort of workplace altercation with a medical assistant, but the only evidence she cites in support of this claim is Mariscal's testimony that De Jesus had a falling out with Gonzalez and that both individuals asked to be placed with other providers. (DSOMF, Ex. M, Mariscal Dep. 92:15–22.) In sum, the Court sees no evidence of conduct on the part of De Jesus that comes close to the sort of performance issues Khungar had.

Second, with respect to Angel, Khungar again offers little in the way of comparable conduct. She contends only that Angel also committed a HIPAA violation and allegedly threatened Khungar yet was not disciplined. But neither Angel nor Khungar faced termination for their purported HIPAA violations. Moreover, the suggestion that Angel threatened Khungar by having Gonzalez tell her that Angel "knows karate" seems to be a stretch—particularly given that Gonzalez followed up the statement with "lol," a term commonly understood to mean "laugh out loud" and used to indicate that a statement is made in jest. Even if Angel did threaten Khungar, Angel and Khungar worked in entirely different circumstances: Angel was a medical assistant who reported to Mariscal, while Khungar was a pediatrician who reported to Barron and Mejia.

In short, Khungar has failed to satisfy her burden of finding at least one other employee comparable to her "in all material respects." *Burks*, 464 F.3d at 751 (citation and internal quotation marks omitted). Since neither of the individuals Khungar identifies constitutes a suitable comparator, this provides a second reason that Khungar cannot make out a *prima facie* case of discrimination using the *McDonell Douglas* approach. See *McGowan v. Deere & Co.*, 581 F.3d 575, 580 (7th Cir. 2009) ("Because [the plaintiff] is unable to demonstrate that a similarly-situated person not in the protected class was treated more favorably than he was, he cannot make out a *prima facie* case of racial discrimination.").

### B. Legitimate Nondiscriminatory Reason and Pretext

As Khungar has failed to establish a *prima facie* case under *McDonnell Douglas*, the Court's analysis could end there. But even if she could make out a *prima facie* case, Khungar still would not survive summary judgment because ACHN has presented a legitimate

nondiscriminatory reason for terminating her and she has not created a triable issue as to whether that reason was a pretext.

ACHN claims that it terminated Khungar due to her poor work performance and has adduced ample evidence to support that position. As noted above, there were numerous patient complaints against Khungar, and some other employees believed that she was putting patient safety at risk. In addition, Khungar had received a warning for violating patient privacy laws after she accessed a patient's file to find contact information for an absent employee.

Khungar contends that Mariscal and De Jesus worked together to solicit the patient complaints to retaliate against Khungar for complaining about Mariscal's favoritism toward De Jesus and other racist comments. But the evidence Khungar cites in support of this narrative is thin. For instance, to support the contention that Mariscal actively solicited patient complaints, Khungar points to a line in an email from Mariscal stating "I know we are compiling information" with respect to Khungar. (PRSOMF ¶ 27.) But when questioned at her deposition, Mariscal explained that she was told to record incidents and send the reports to her superiors. (DSOMF, Ex. G, Mariscal Dep. 56:4–15, Dkt. No. 49-7.) It is a significant stretch to read her comment in the email to imply that Mariscal was not simply compiling information but instead actively soliciting it from the parents of patients. Since Khungar points to no other support in the record, the Court cannot make such a leap in logic as to infer that Mariscal and De Jesus were actively seeking out complaints.

Khungar nonetheless contends that the complaints are entirely pretext and that she was actually targeted for termination because of her race, national origin, or religion.[3] In support of

---

[3] The Court notes that Khungar's First Amended Complaint does not contain a hostile work environment or harassment claim, and it does not mention any adverse employment action other than her termination.

this claim, Khungar relies on statements by her coworkers that she claims exhibited their prejudice and intent to discriminate against her. For example, her fellow employees made fun of her for her "ethnic cooking" and "Indian religion." (PRSOMF, Ex. 43, Khungar Decl. ¶ 23.)

However, "[d]erogatory statements made by someone who is not involved in making the employment decision at issue are not evidence that the decision was discriminatory," although it may be possible to infer discriminatory intent if the person who made the statements had input into the adverse employment action and made the statements around the time of and in reference to the action. *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005). Here, none of the allegedly discriminatory remarks about Khungar were made by her supervisors, and there is no evidence that the individuals who did make the arguably discriminatory remarks had input into the decision to terminate her. Khungar offers no evidence suggesting that Barron, Mejia, Mafla, or Riley collaborated with Mariscal to solicit complaints against Khungar or otherwise discriminate against her. So even if Khungar had adduced sufficient evidence that Mariscal and other employees manufactured complaints against her because of her race, national origin, or religion, Khungar has not presented any evidence that would permit a factfinder to attribute that discriminatory intent to her supervisors. Khungar has, therefore, failed to show that ACHN's stated reason for terminating her was pretext.

In sum, Khungar has not presented sufficient evidence of a triable issue of fact on her discrimination claim. Accordingly, the Court grants summary judgment in favor of ACHN on Count I.

---

Thus, her Title VII discrimination claim is based entirely on the adverse employment action of her termination.

## II.        Retaliation (Count II)

In Count II, Khungar claims that ACHN terminated her in retaliation for her complaints about the hostility she faced from her co-workers.

In addition to prohibiting discrimination, Title VII also prohibits employers from retaliating against employees for engaging in activity protected by the statute. 42 U.S.C. § 2000e-3(a). To survive summary judgment on her Title VII retaliation claim, Khungar must adduce sufficient evidence that "(1) [s]he engaged in an activity protected by the statute; (2) [s]he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). Similar to disparate treatment discrimination claims, older retaliation case law distinguished between a direct method of proof, which relied on a "direct causal link," and an indirect method, which relied on the *McDonnell-Douglas* burden-shifting framework. *Id.* But the Seventh Circuit more recently has made clear that those two methods are not separate legal standards but instead "just means to consider whether one fact . . . caused another." *Id.* (quoting *Ortiz*, 834 F.3d at 764–65). The fundamental question is simply whether a proscribed factor caused an adverse employment action. *Id.* at 866–67 (citing *Ortiz*, 834 F.3d at 764–65).

Khungar has shown that she engaged in protected activity by reporting discriminatory statements to her supervisors on three occasions and by filing a charge with the EEOC. *See* 42 U.S.C. § 2000e-3(a). And Khungar suffered an adverse employment action when ACHN terminated her on December 14, 2016. But she has failed to establish a genuine issue of material fact as to whether the protected activity caused her termination. As noted above, there were numerous patient complaints against Khungar, she had received a written warning for violating patient privacy laws, and shortly before her termination she made a statement that some

19

employees took as a threat. The best evidence of causation to which Khungar can point is that ACHN terminated her about two weeks after she filed an EEOC charge, which could indicate suspicious timing. But ACHN, in turn, can point to unrebutted record evidence that the person who made the decision to terminate Khungar did not know about the EEOC charge when he fired her. (DSOMF ¶ 71; *id.*, Ex. B, Riley Decl. ¶ 7.) *See Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (explaining that "[a]s a threshold matter, the plaintiff must show that the defendant was aware of the protected conduct;" only then may suspicious timing alone demonstrate a causal connection). Given the lack of other reasons to infer a retaliatory discharge—such as similarly-situated employees who were not fired or more satisfactory job performance by Khungar—the Court concludes that judgment for ACHN as a matter of law is appropriate as to Count II.

## III.    Motions to Strike

Before concluding, the Court must also address the parties' multiple motions directed toward the record. The Court has left its disposition of these motions to the end because Khungar's claims fail regardless of whether the materials about which each side complains are considered as part of the record, but some explanation for the Court's rulings is nonetheless appropriate.

### A.    ACHN's Motion to Strike Khungar's Unemployment Decisions

Motions to strike, while permissible, are generally disfavored because they most often serve only to delay litigation. *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989). In this case, ACHN asks the Court to strike as inadmissible hearsay two exhibits Khungar submitted in support of her response to ACHN's Local Rule 56.1 Statement: a 2017 decision from the Illinois Department of Employment Security ("IDES") on Khungar's eligibility for unemployment benefits and a 2017 IDES Board of Review decision. (*See* Dkt. No.

70.) Khungar has offered the decisions to show that the December 10, 2016 incident when she allegedly made threats toward her employer was not, in fact, misconduct worthy of termination.

Motions to strike should be reserved for matters that are truly redundant, immaterial, impertinent, or scandalous; they should not be used to assert mere inadmissibility of otherwise inoffensive evidence. *See* Fed. R. Civ. P. 12(f); *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141–42 (7th Cir. 2009). Evidentiary objections are better raised in the context of the summary judgment filings provided for in Federal Rule of Civil Procedure 56 and Local Rule 56.1, which, for example, allow a party to respond to a purportedly undisputed fact by objecting that the fact cannot be presented in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56 (c)(2). Filing a separate motion to strike is generally not helpful, as it simply multiplies the number of motions and pages of briefing. Indeed, this is the very reason why motions to strike are considered "disfavored."

In any case, the Court agrees that the decisions here are unlikely to be admissible at trial and therefore cannot create a triable issue of material fact. But even considering those decisions as support for Khungar's view of the December 10 incident, ACHN still has provided ample evidence in the form of patient complaints and a purported HIPPA violation that Khungar was not meeting her employer's legitimate expectations and that ACHN had a non-discriminatory reason for terminating her. Nothing in the IDES and Board of Review decisions changes the fact that Khungar has failed to identify a similarly-situated individual who was treated differently by ACHN than she was treated. In the end, the Court finds it unnecessary to strike the IDES and Board of Review decisions. But even considering them, they have no impact on the Court's conclusion that ACHN is entitled to summary judgment in its favor. The Court therefore denies ACHN's motion to strike those decisions.

### B.     ACHN's Motion to Strike Declarations

ACHN has also moved to strike five paragraphs of Khungar's declaration and all of Victoria Navarro's declaration, which Khungar relies on in her response to Defendant's Rule 56.1 statement and statement of additional facts. (*See* Dkt. No. 71.) ACHN claims that certain paragraphs of Khungar's declaration are inadmissible hearsay or contradict her deposition testimony, and that each statement in Navarro's declaration is either inadmissible hearsay, lacking in foundation, or time barred. ACHN also contends that Khungar improperly failed to identify Navarro in her initial disclosures as someone who possessed relevant knowledge or information.

While it asks the Court to strike the offending statements, ACHN appears to rely on Federal Rule of Civil Procedure 56(c), a procedural rule that allows a party to object to record evidence in a summary judgment proceeding that could not be presented in an admissible form at trial but does not expressly provide a means to strike material. *See* Fed. R. Civ. P. 56(c)(2), (4). As discussed above, in most circumstances, it is unnecessary for the Court actually to strike exhibits allegedly containing evidence that could not be admitted in any form at trial. That is the case here. ACHN's motion to strike is thus denied.

### C.     Khungar's Motion to Strike ACHN's Reply

As part of its summary judgment briefing, ACHN has submitted a reply in support of its initial Rule 56.1 statement of material facts—or what it labels as Defendant's Replies to Plaintiff's Responses to Defendant's Rule 56.1 Statements. (Dkt. No. 75.) Khungar moves to strike this reply as impermissible under Local Rule 56.1.

The purpose of Local Rule 56.1 is "to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination."

*Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). The Rule permits the movant to submit a "concise reply" if the opposing party submits "***additional*** material facts." L.R. 56.1(a) (emphasis added). It does not, as ACHN contends, provide for a reply in support of the movant's initial statement of material facts. Moreover, at no point did ACHN seek leave from the Court to file its reply statement of material facts, which amounted to 80 pages of additional material. District courts are "entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Accordingly, the Court grants Khungar's motion to strike the reply and disregards the reply in its entirety.

### D. ACHN's Remaining Motions

ACHN also moves to substitute Exhibit F in its summary judgment papers on the basis that it inadvertently submitted Mejia's declaration without a signature page. (Dkt. No. 76.) Khungar opposes the request, contending that ACHN is attempting to include new documents along with the declaration. The Court might be more sympathetic to that concern if the additional exhibit—Mejia's declaration—had not already been included in ACHN's initial submission. (*See* Dkt. No. 49-12.) But since the email chain about which Khungar complaints was previously submitted in its entirety as Exhibit K, the Court finds no prejudice to Khungar and grants ACHN's motion to substitute the exhibit.

Lastly, ACHN has filed a motion to file an amended reply that would exceed the page limit for a brief by one page. (Dkt. No. 83.) ACHN contends that it needs to file an amended reply to address Khungar's hearsay evidence in the event that the Court, as it has above, grants Khungar's motion to strike ACHN's impermissible reply in support of its Rule 56.1 statement of material facts. The Court accepts that ACHN did not realize it needed another avenue in which to preserve its hearsay objections (other than the improper reply)—although ACHN should have

been aware that, at the very least, it needed to seek leave from the Court to file a reply statement of material facts and that, therefore, such a filing may not have been the best way to present its only arguments about hearsay. The Court grants ACHN's request to file an amended reply and exceed page limits.

## CONCLUSION

For the foregoing reasons, ACHN's motion for summary judgment (Dkt. No. 50) is granted. The Clerk will enter Judgment in favor of ACHN and against Khungar. In addition, ACHN's motions to strike Khungar's exhibits and declarations (Dkt. Nos. 70, 71) are denied. Khungar's motion to strike ACHN's improper reply in support of its Rule 56.1 Statement of Material Facts (Dkt. No. 80) is granted. Finally, ACHN's motions to substitute Exhibit F (Dkt. No. 76) and to file an amended reply brief (Dkt. No. 83) are granted.

ENTERED:

Dated: May 7, 2020

Andrea R. Wood
United States District Judge