In the

# United States Court of Appeals

### For the Seventh Circuit



CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 20-1958

POOJA KHUNGAR,

*Plaintiff-Appellant,*

*v.*

ACCESS COMMUNITY HEALTH NETWORK,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-01454 — **Andrea R. Wood**, *Judge.*

---

ARGUED DECEMBER 10, 2020 — DECIDED JANUARY 19, 2021

---

Before SYKES, *Chief Judge*, and FLAUM and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Dr. Pooja Khungar, a pediatrician at Access Community Health Network, alleges that Access discriminated against her on account of her national origin, race, and religion, and retaliated against her for opposing that discrimination. Access argues that it fired Khungar because she was a bad employee and made a threatening statement.

The district court ruled in favor of Access and granted it summary judgment on both claims. We agree with the district court and therefore affirm its opinion and order.

## I. Background

Defendant Access Community Health Network operates several Chicago-area health centers that provide affordable medical care for underserved populations. Plaintiff Dr. Pooja Khungar began working as a pediatrician at Kedzie Family Health Center, one of Access's clinics, in July 2014.

Khungar's time at Access proved tumultuous. About a year into her employment, in August 2015, she received a "final warning" from Dr. Charles Barron—regional medical director and Khungar's immediate supervisor—based on Khungar's accessing of a patient's medical file to obtain a coworker's phone number, which Barron determined to be a violation of the Health Insurance Portability and Accountability Act ("HIPAA"). And in November of that year, Khungar reported to Barron an earlier incident in which Alicia Mariscal, Kedzie's health center manager, said to Khungar, "People think you Indians are so nice, but you're pretty pushy. Some of you women can be real assertive sometimes." Barron then spoke with Khungar and Mariscal, who made no more overtly inappropriate comments to Khungar thereafter.

But things at Kedzie really started deteriorating in May 2016, as complaints about Khungar began rolling in from Access staff and the parents of her minor patients. These complaints were typically routed through Dr. Tara De Jesus (Kedzie's only other pediatrician) or Mariscal—who logged them in a software tool called "SafetyZone Portal"—to Barron or Dr. Jairo Mejia, who became chief medical officer and

began supervising Access's physicians, Khungar included, in February 2016.

To summarize the complaints:

- In May, a patient's mother complained that Khungar had insulted her daughter and did not properly examine her. The same month, medical assistant Jasmine Angel complained that Khungar insulted another medical assistant, Gloria Rosales. Khungar later called Angel a "back stabber" and lodged a complaint against her based on a year-old Facebook post that Khungar claimed was a HIPAA violation.

- In June, a patient's mother complained that Khungar told her son to stop taking his psychiatric medication because she felt it would make him "impotent." And De Jesus complained that Khungar was sharing inappropriate personal information with patients and staff. (Also in June, Access's credentialing committee certified that Khungar was fully credentialed and "competent," and Access then renewed her contract for two more years.)

- In July, another parent complained that Khungar failed to properly examine her daughter, who was later sent to the emergency room for appendicitis. De Jesus also reported that Khungar made an unauthorized addendum to one of De Jesus's treatment notes of a patient.

- In August, Mariscal documented a complaint about Khungar refusing to treat patients who she believed arrived late to their appointments; a mother complained that Khungar had misdiagnosed her sons, who needed surgery; and another parent complained that Khungar

failed to treat her child's ear pain (De Jesus later found the tip of a cotton swab lodged in the child's ear).

These complaints were brought to the attention of Access's Human Resources department. For example, in June 2016, Mejia wrote to Eleva Riley, Access's Vice President of HR: "You probably are aware of multiple situations with … Dr. Khungar at Kedzie. As per her behavior, she is clearly not mentally stable. We need to closely observe. … If you have additional recommendations from an HR perspective, I'd be happy to follow."

And in July, after meeting with Barron to discuss Khungar's performance, Mejia emailed Stephanie Lilly at HR and told her that Khungar's situation is "[v]ery complicated." He intimated that he was considering recommending Khungar's termination but was concerned about the lack of other pediatricians to cover her patients. Mejia told Lilly that he was "keeping the situation on hold to observe how she behaves and [would] make a decision accordingly." Lilly responded, "Yes, Dr. Khungar is a very complicated situation … . [S]he causes conflict amongst staff and has little to no emotional intelligence. I think it's inevitable that she'll have to be let go some time soon."

The last complaint in August was the straw that broke the camel's back, prompting Mejia to officially recommend Khungar's termination to Riley. Mejia testified that he made this decision in light of the nature and volume of the complaints, that he made it alone, and that he was unaware of Khungar's race, religion, and national origin at the time.

Mejia went to Kedzie on September 28, 2016, and met with Mariscal, De Jesus, and a regional manager to explain that he

No. 20-1958                                              5

would be recommending to HR that Khungar be issued the ninety-day notice required under her employment agreement. Mejia informed De Jesus that she would be responsible for treating Khungar's patients moving forward and that the overflow would be referred to another clinic.

Later that day, Mejia emailed Riley and Lilly at HR:

> I receive poor reports about Dr. Khungar almost every week, and although I've been trying to entertain this situation, her bad performance is putting our patients and the organization at high risk. She has several issues regarding patient care, bedside manners, and the way she interacts with the staff at the clinic. In some cases, patients have been at risk because of her decisions. Cases are well documented. Last year, she was given a <u>final notice</u>, under the direction of Dr. Barron. However, no change has been noticed in her behavior. We have an enormous amount of documentation including complains [sic] from patients, employees and occurrence reports on the safety zone. I'm recommending immediate termination of this provider … . Please let me know how to proceed.

Lilly responded that she would "begin gathering the information to substantiate our decision to terminate and then meet with [Riley]. We will get back to you[] shortly."

Riley then reviewed the SafetyZone Portal reports and other complaints and approved Mejia's recommendation. Riley testified that she was unaware of Khungar's race, religion, and national origin at the time.

A couple days later, another Access employee asked Mariscal a question about the status of a prior complaint.

Mariscal responded, "I know we are compiling information on Dr. Khungar, but a provider must speak to her about all the complaints she is getting on treatment//care of patients. … I don't think these incidents have been addressed." Mariscal testified that she had been documenting complaints at Mejia's request and as part of her job duties. Mejia testified that they were assembling the documentation for HR.

Mejia, Lilly, and Barron's replacement[1] met with Khungar on November 21, 2016, and informed her that Access was triggering the ninety-day notice per her agreement. Later that day, Khungar emailed Mejia and Riley to assert that her past complaints of "cultural insensitivity" had never been addressed. Khungar referred to an email she had sent to Mariscal in June 2016 about a conversation Khungar had with Rosales, the medical assistant. Rosales had asked Khungar if she believes in God and if she would ever date a Hispanic man, and Khungar had asked Mariscal to talk to Rosales about appropriate workplace conversations. Mariscal testified that she had spoken with Rosales, who became "sad and stunned" at the accusations and said it was *Khungar* who brought up God. Mariscal also testified that she later informed Khungar of her conversation with Rosales.

Mejia quickly responded to Khungar's November 21 email, affirming that Access takes such allegations seriously but stating that "[n]one of these allegations were brought to my attention prior to our termination meeting with you this

---

[1] Barron left Access in August 2016, and Dr. Andres Mafla had by now taken over as acting regional medical director. Mafla did not arrive until after most of the pertinent events took place and was not involved in the decision to terminate Khungar.

No. 20-1958                                                    7

morning." He also forwarded her email to Riley, who repeatedly attempted to schedule a meeting with Khungar, but Khungar twice canceled the meeting because she was sick. Khungar ultimately departed before the meeting took place.

On November 30, 2016, Khungar filed an EEOC charge against Access, alleging discrimination on the basis of race, sex, religion, and national origin. Khungar told Mariscal of the EEOC charge the week after she filed it, but Riley testified that she did not receive notice of it until December 23.

Things took another turn on December 10, when Khungar received an important document concerning a patient's vaccination as she sat near a group of medical assistants. Because Khungar had already been given her ninety-day notice, she said something to the effect of, "If anything happens to this piece of paper, if there's a fire, if there's a flood, if somebody rips this piece of paper, I can't come back and sign it. We're going to lose a $20,000 vaccine." But there is some disagreement about what exactly was said; a medical assistant testified that Khungar said, "What will happen if this place got on fire?" According to Khungar, the medical assistant replied, "Don't do it!" But the medical assistant recalls saying, "Just don't do it when I'm here, I have kids."

A physician later overheard the medical assistant discussing Khungar's statement with a coworker and reported it to HR because she perceived it to be threatening in nature. Riley went to Kedzie to investigate the incident on December 14 and met with the physician and medical assistant involved. Then she met with Khungar (for the first time) and told her, "We heard that you threatened to burn down the workplace." Khungar says she asked if Riley was referring to jokes made by Kedzie staff about her not being a good cook or her Indian

descent and said that she was offended that Riley would ac-
cuse her of being a threat. According to Riley, though, Khun-
gar responded, "That's not what I said. What I said was, 'what
happens if the place blows up when I leave.'"

Khungar denies saying this, but Riley testified that it
caused her to fire Khungar on the spot (and place a security
guard at the clinic's door for several weeks). Riley memorial-
ized the conversation in a letter to Khungar a few days later:

> [M]ost concerning to us, is that it was alleged that
> you had threatened to burn down the Kedzie
> [clinic]. When confronted with this allegation, you
> admitted to a conversation in which a similar state-
> ment was made, but indicated that you were only
> kidding and that your actual statement was "What
> will happen if the place blows up when I leave."

> Dr. Khungar, let me be clear. Such language is not
> humorous … . Indeed, you threatening and/or im-
> plying harm and destruction to ACCESS' property
> and potentially its staff and patients is something
> that ACCESS takes very seriously and is simply un-
> acceptable and will not be tolerated.

Khungar then amended her EEOC charge to add her De-
cember 14 termination and a retaliation claim. The EEOC is-
sued a right to sue notice, and Khungar filed her complaint in
the district court on February 26, 2018, alleging discrimination
and retaliation under Title VII of the Civil Rights Act of 1964.
In addition to the above allegations about Rosales's discrimi-
natory remarks, Khungar asserts that Rosales placed Chris-
tian pamphlets in Khungar's patient rooms and that De Jesus
mocked her Indian accent and said that she was the "anti-
christ," "not a good Christian doctor," "not of our back-
ground," and doesn't speak "good English"—but Khungar

admits that she never reported any of these incidents to Access. She also asserts that Mariscal purposely excluded her from certain meetings throughout her time at Access.

On May 7, 2020, the district court granted Access's motion for summary judgment on both claims. The court concluded that Khungar's discrimination claim failed because she "cannot make out a *prima facie* case of discrimination" and the evidence showed nondiscriminatory and nonpretextual reasons for Khungar's termination. As for her retaliation claim, Khungar "failed to establish a genuine issue of material fact as to whether [her] protected activity caused her termination." Khungar timely appealed.

## II. ANALYSIS

We review the district court's grant of summary judgment *de novo*, construing facts in the light most favorable to Khungar and drawing all reasonable inferences in her favor. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011) (citing *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010)). "Summary judgment is appropriate where the admissible evidence shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[S]peculation is not sufficient to survive summary judgment," *Piotrowski v. Menard, Inc.*, 842 F.3d 1035, 1039 (7th Cir. 2016); "there must be evidence," *Anderson*, 477 U.S. at 252.

### A. Discrimination Claim

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment, a plaintiff must present evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself … ." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[2]

"*Ortiz*, however, did not alter '[t]he burden-shifting framework created by'" *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 766). That "well-known and oft-used" standard "remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (citing *David*, 846 F.3d at 224).

Under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she

---

[2] Khungar relies to some extent on the "direct" and "indirect" "methods" of proving discrimination. We reiterate that litigants "must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards. … Instead, all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 765–66.

suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (citing *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016)). If the plaintiff makes a *prima facie* case, "the burden shift[s] to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id.* (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765). The district court applied that framework and concluded that Khungar lacks evidence to satisfy the second and fourth elements of a *prima facie* case (the other elements are not in dispute) and that the evidence showed legitimate, nondiscriminatory, and nonpretextual reasons for her termination.

We have acknowledged, however, that the *McDonnell Douglas* framework, while often useful, is not particularly helpful in organizing the evidence where the main issue is the plaintiff's job performance. Rather, when "the issue of satisfactory job performance … lies at the heart of th[e] dispute [and] must be analyzed in detail at [multiple] stages of the *McDonnell Douglas* test," it is often "simpler to run through that analysis only once." *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002); *accord Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010); *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008).

That is, by and large, the case here. At the heart of this dispute are the questions of whether Khungar performed poorly and whether that poor performance caused her termination.

These questions go to her *prima facie* case, the nondiscriminatory reasons for her termination, and whether those reasons were pretextual. We therefore run through that analysis only once, *Simmons*, 289 F.3d at 492, with our true goal top of mind: determining whether the evidence, "as a whole," "would permit a reasonable factfinder to conclude that" Khungar's national origin, race, or religion caused her termination, *Ortiz*, 834 F.3d at 765. For the reasons below, we don't believe it would.

### 1. *Khungar's Performance and Reasons for Her Termination*

Khungar argues that she was a satisfactory employee who was fired for discriminatory reasons. Access argues that she was anything but. It points to Khungar's HIPAA violation and the swarm of complaints against her, which it says prompted Mejia to recommend her termination. And that defeats Khungar's claim because it precludes her from satisfying the second element of her *prima facie* case (that she met expectations) and establishes nondiscriminatory and nonpretextual reasons for her termination (she failed to meet expectations).

Strictly speaking, a plaintiff's own assertion that she met her employer's expectations *might* be sufficient to establish the second element of her *prima facie* case. *Oates v. Discovery Zone*, 116 F.3d 1161, 1171 (7th Cir. 1997). *But see Dickerson v. Bd. of Trs. Of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011) (An employee's "own evaluation of his work cannot be imputed to [the employer] and is insufficient to permit his case to survive past summary judgment."). But even if Khungar could satisfy that part of her *prima facie* case, the evidence "as a whole" puts beyond genuine dispute the issues of whether Khungar actually met Access's expectations or was fired for failing to do so. *Ortiz*, 834 F.3d at 765.

In considering whether Khungar met Access's expecta-
tions, "[t]he proper inquiry mandates looking at [Khungar's]
job performance through the eyes of her supervisors at the
time." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008)
(citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir.
2002)). "The question is not whether the [employer's perfor-
mance] ratings were *right* but whether the employer's descrip-
tion of its reasons is *honest.*" *Gustovich v. AT & T Commc'ns,
Inc.*, 972 F.2d 845, 848 (7th Cir. 1992); *see Dickerson*, 657 F.3d at
603 ("[A]lthough [plaintiff] disagreed with his [employer's]
negative evaluations, that does not mean that the evaluations
were the result of unlawful discrimination.").

Khungar's supervisors were Barron (until he departed in
August 2016) and Mejia (after February 2016). And both Bar-
ron and Mejia had ample reason to believe that Khungar was
not meeting expectations. Both were familiar with Khungar's
record, marred as it was with complaints from patients' par-
ents and Access personnel. Mejia testified that these com-
plaints formed the basis of his termination recommendation,
and that testimony is supported by documentary evidence—
in particular, Mejia's termination recommendation itself,
which expressed concern that Khungar's "bad performance is
putting our patients and the organization at high risk."

On top of the parent and staff complaints, Khungar also
received a "final warning" from Barron about a HIPAA viola-
tion in August 2015. Khungar asserts that this "stale" warning
did not have "anything to do with her termination," but
Mejia's email disproves that contention: "[Khungar] was
given a <u>final notice</u>, under the direction of Dr. Barron. How-
ever, no change has been noticed in her behavior."

Khungar says her recredentialing in mid-2016 shows that she met Access's expectations. But her recredentialing came before many of the complaints. *See Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993) ("The critical issue is whether she was performing well in her job *at the time of her termination*." (emphasis added)). What's more, Access's director of practice management—who oversees the recredentialing process—averred that that process is simply *not* a performance evaluation. It thus does little to show anything other than that Khungar had her professional credentials in order. (Her actual performance evaluation from 2016 notes that Barron "[d]iscussed behavioral concerns" with her, but Khungar disputes this.)

Aside from that, Khungar mostly attempts to undermine the complaints against her. None of these efforts succeed.

She first asserts that the complaints simply aren't real. Her theory is that De Jesus and Mariscal "mischaracterized," "exaggerated," "made up," "solicited," or outright "fabricated" these complaints to get back at Khungar for telling Barron about Mariscal's racist comments in November 2015. In support, Khungar points out that the complaints weren't brought to her attention, and she highlights Mariscal's statement that she was "compiling information on Dr. Khungar." But to infer from this that the complaints were illegitimate is not "justifiable." *Anderson*, 477 U.S. at 255. That Khungar wasn't informed of each complaint tells us only that; it does not mean they were fictitious. And Khungar ignores the rest of Mariscal's statement—that "a provider must speak to her about all the complaints she is getting on treatment//care of patients"—which would make little sense if the complaints were figments of Mariscal's own imagination. Likewise, Khungar

ignores Mejia's and Mariscal's testimony that they were
merely putting together information for Human Resources in
anticipation of invoking the ninety-day notice.[3]

Second, Khungar argues that the complaints are inadmis-
sible hearsay. Hearsay is an out-of-court statement offered to
prove the truth of the matter asserted. Fed. R. Evid. 801(c). The
complaints here are not hearsay because they are not offered
to show that Khungar in fact engaged in the conduct com-
plained of, but to show Mejia's "state of mind when he made
his recommendation." *Stewart v. Henderson*, 207 F.3d 374, 377
(7th Cir. 2000); *see Luckie v. Ameritech Corp.*, 389 F.3d 708, 716
(7th Cir. 2004).

Third, Khungar argues that her termination was
"unusual"—and thus pretextual—because Access did not
"conduct an investigation" into her conduct or "follow its
normal policy." She lacks both legal and evidentiary support
for this argument. For one, Mariscal's statement about
"compiling information on Dr. Khungar" shows that there
was some level of investigation into Khungar's conduct. But
more importantly, Mejia testified that there is no Access
"policy" or "procedure" for responding to patient complaints.
Perhaps Access should standardize its process, but "[w]e do

---

[3] Khungar also makes a related argument that Access is liable under
a "cat's paw" theory because De Jesus and Mariscal fed false complaints
to, and had a "secret meeting" with, Mejia. This argument fails without
evidence that the complaints were fabricated, *see Simpson v. Beaver Dam
Cmty. Hosps., Inc.*, 780 F.3d 784, 798 (7th Cir. 2015), and Mejia testified that
he decided to recommend Khungar's termination *before* he met with De
Jesus and Mariscal to keep them apprised of staffing issues—so that meet-
ing could not have caused his recommendation, *see Johnson v. Koppers, Inc.*,
726 F.3d 910, 914 (7th Cir. 2013).

not 'tell employers how to discipline employees; rather, [we] ensure that the process is not discriminatory.'" *Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 752 (7th Cir. 2009) (quoting *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001)).

And finally, Khungar shifts to her immediate termination on December 14, 2016, arguing that the reason given for that termination—her alleged statement about "blowing up" or "burning down" the Kedzie clinic—was pretextual. Her argument is that she never in fact made a threatening statement. In support, she points to Illinois Department of Employment Security ("IDES") decisions stemming from her state unemployment compensation proceedings. Those decisions concluded that Khungar never made a statement about burning down the Kedzie clinic "or any other threatening statement." The district court here concluded that the IDES decisions "are unlikely to be admissible at trial," but "even considering those decisions," Access "still has provided ample evidence in the form of patient complaints and a purported [HIPAA] violation that Khungar was not meeting her employer's legitimate expectations and that [Access] had a non-discriminatory reason for terminating her."

Several district courts have "found that the findings of Illinois unemployment compensation proceedings are not admissible in federal civil actions." *Wittenberg v. Wheels, Inc.*, 963 F. Supp. 654, 660 (N.D. Ill. 1997) (citing *Rekhi v. Wildwood Indus., Inc.*, 816 F. Supp. 1312 (C.D. Ill. 1993), *aff'd*, 61 F.3d 1313 (7th Cir. 1995)). Not only are the IDES decisions hearsay—Khungar wishes to use them to prove that she did not make a threatening statement, which is what those decisions assert—but under Illinois law, they "have no preclusive effect in other

proceedings, and we give state judgments the same preclusive effect that they would receive under state law." *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 555 (7th Cir. 2011) (nonprecedential) (citation omitted) (first citing 820 Ill. Comp. Stat. 405/1900(B); and then citing 28 U.S.C. § 1738; *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 430 (7th Cir. 2009)). Therefore, Khungar "may not rely on th[ose] decision[s] to create a genuine issue of material fact as to the motivations for her discharge." *Wittenberg*, 963 F. Supp. at 661; *see Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) ("To defeat a summary judgment motion … a party may rely only on admissible evidence.") (citing, among other cases, *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007)).

At any rate, even if we assume that Khungar never made a "threatening statement," even Khungar does not dispute that she made *a* statement on December 10 that another physician interpreted as a threat and reported to Riley, who then came to Kedzie to investigate. Nor does she dispute that Riley confronted her about the statement, sent her a letter reiterating the "alleg[ation] that [she] had threatened to burn down the Kedzie [clinic]," and placed security at the entrance to the clinic. Again, what matters is what Riley believed at the time she made the decision to terminate Khungar. *Gustovich*, 972 F.2d at 848. The undisputed evidence shows that Riley had cause to believe that Khungar made a threatening statement, regardless of whether we consider the IDES decisions.

In sum, the evidence as a whole shows that Khungar's performance was woefully deficient and that Access had nondiscriminatory and nonpretextual reasons to terminate her. We therefore conclude that Khungar lacks evidence creating a genuine question as to the reasons for her termination.

### 2. *Similarly Situated Individual*

The district court also held that, under *McDonnell Douglas*, Khungar's *prima facie* case fails because she lacks evidence showing that a similarly situated individual at Access not belonging to her class received better treatment. Below, Khungar argued that two individuals were treated better than she was, but the district court rejected that argument because those two were not appropriate comparators. But Khungar abandons that argument on appeal and now advances a new argument: that she doesn't even *need* to show that similarly situated employees were treated differently because she's alleged only one instance of discrimination, her termination. She cites *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir. 1986), which appears to have taken that position.

Khungar "has tossed [this argument] into the case for the first time on appeal," and it is therefore forfeited. *HyperQuest, Inc. v. N'Site Sols., Inc.*, 632 F.3d 377, 382 (7th Cir. 2011). We also note that *Yarbrough* is of dubious endurance, for we have held many times since 1986 that employees who allege discriminatory termination must satisfy this *prima facie* element.[4]

But even if *Yarbrough* lives—and stands for what Khungar says it does—that only means that Khungar must prove as part of her *prima facie* case that Access "sought a replacement for [her]" rather than that a similarly situated individual was

---

[4] *E.g.*, *Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012) (Plaintiff who alleged discriminatory termination failed to show that similarly situated white officers received better treatment.); *Jones v. A.W. Holdings LLC*, 484 F. App'x 44, 48 (7th Cir. 2012) (nonprecedential); *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680–81 (7th Cir. 2002).

No. 20-1958                                                    19

treated differently. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1114 (7th Cir. 1992) (quoting *Yarbrough*, 789 F.2d at 511); *see Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999) ("In discriminatory discharge cases, … a plaintiff generally meets the *prima facie* burden if she establishes that … her employer sought a replacement for her." (citing *Hong*, 993 F.2d at 1257)). Khungar never makes that argument and points to no evidence on that point, so that argument, too, is forfeited. *Cf. Yarbrough*, 789 F.2d at 511 n.5 ("There is … no need for us to consider the issue whether Yarbrough established that Tower either sought or found a replacement for him, because Tower failed to raise this issue on appeal.").

We agree with the district court that Khungar lacks evidence creating a triable issue of material fact as to her discrimination claim. Summary judgment was therefore appropriate.

### B.  Retaliation Claim

Finally, we turn to Khungar's retaliation claim. Title VII "makes it unlawful 'for an employer to discriminate against any of his employees or applicants for employment' who have … availed themselves of Title VII's protections." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 339 (1997) (quoting 42 U.S.C. § 2000e-3(a)). To survive summary judgment, Khungar must adduce evidence to establish "a causal link between [her] protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). The question is: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *Ortiz*, 834 F.3d at 765). The district court concluded that Khungar lacks evidence to show that her protected activity caused her termination. We agree.

Khungar claims that her immediate termination by Riley on December 14, 2016 was retaliation for (1) Khungar's November 2015, June 2016, and November 2016 complaints of discrimination and (2) her November 30, 2016 EEOC charge. Aside from repackaging many of the same arguments rejected above, Khungar relies primarily on "suspicious timing"; she argues that a jury could find that her termination was caused by these events because it occurred two weeks after the EEOC charge and soon enough after her other complaints.

"Suspicious timing is rarely enough to create a triable issue." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). "As a threshold matter, the plaintiff must show that the defendant was aware of the protected conduct. If [so], a causal connection can then be demonstrated by suspicious timing alone only when the employer's action follows on the close heels of protected expression." *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (citation omitted) (first citing *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004); and then citing *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001)). "At minimum, therefore, [Khungar] must offer evidence that would support a reasonable inference that [Riley] was aware of [Khungar's] allegations of discrimination." *Luckie*, 389 F.3d at 715.

Here, the undisputed evidence shows that Riley did not know about Khungar's EEOC charge on December 14, 2016. Riley testified that she first learned of the EEOC charge on December 23, 2016. An email to Riley on that day confirms this: "We received a notice of charge of discrimination by the EEOC, today in the morning." Khungar responds that she told *Mariscal* about the EEOC charge a week after she filed it. But what Khungar told Mariscal is irrelevant because Mariscal did not make the decision to terminate Khungar. *See*

*Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir. 2000).
Plus, Mariscal and Riley both testified that they did not dis-
cuss Khungar's termination or her December 10 statement,
and Riley testified that she did not make the decision to ter-
minate Khungar until speaking with her about that statement.
There is no evidence tying Riley's decision to the EEOC
charge.

Khungar's December 14 termination is likewise unteth-
ered to her other complaints of discrimination. "For an infer-
ence of causation to be drawn solely on the basis of a
suspicious-timing argument, we typically allow no more
than a few days to elapse between the protected activity
and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d
957, 966 (7th Cir. 2012); *cf. Rowlands v. United Parcel Serv.-
Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018) (holding that one
month was sufficient where plaintiff "also presented evidence
of pretext" (quoting *Anderson v. Donahoe*, 699 F.3d 989, 996
(7th Cir. 2012))). Khungar's November 2015 and June 2016
complaints occurred more than a year and more than six
months before her termination, respectively, and there is no
evidence that Riley knew about either of them when she ter-
minated Khungar.

Khungar's final complaint on November 2016 came after
Khungar was given ninety days' notice, and there is no evi-
dence that it influenced Riley's decision to terminate her im-
mediately the next month. If any reasonable inference can be
drawn, it's that the November 2016 complaint prompted Ri-
ley to attempt to resolve the issues complained of before
Khungar departed, not to expedite her departure simply be-
cause she brought them to her attention.

No. 20-1958

We therefore conclude that Khungar lacks evidence tying her December 14 termination to her protected activity, and summary judgment on the retaliation claim was appropriate.

### III. Conclusion

For the reasons above, we conclude that the district court properly granted summary judgment in favor of Access on both of Khungar's claims. We AFFIRM the district court.